UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil File No.: 3:21-CV-98

| | |
|---|---|
| STEVIE LAMONT STUCKES,<br><br>    Plaintiff,<br><br>v.<br><br>PIKE ELECTRIC, LLC,<br><br>    Defendant. | **COMPLAINT**<br>**JURY TRIAL REQUESTED** |

## INTRODUCTION

1. Mr. Stevie Lamont Stuckes ("Plaintiff" or "Stevie") is an African American man who was employed by Defendant Pike Electric, LLC ("Defendant" or "Pike") from November 2017 until May 29, 2020. While working for Pike, Stevie experienced and witnessed racial epithets, racially charged "jokes," and discriminatory comments against African Americans by his co-workers. Common place and indicative of discriminatory culture on Pike jobsites, these comments and "jokes" included phrases like "you don't know where you at, *boy*" and use of words like "nig" and "nigger."

2. In November 2019, Stevie was working as a lineman on a Pike jobsite in Clearwater, Florida ("Clearwater Site"). While working on the jobsite, Stevie experienced two frightening events at the hands of one or more white Pike employees consistent with Pike's discriminatory jobsite culture. The first incident occurred in early November when a white employee threatened Stevie with a knife ("Knife Incident"). Scared by the threat, Stevie backed off quickly to de-escalate the situation. Unfortunately for Stevie, his fear for his safety escalated to terror when he found a noose hanging at his jobsite ("Noose Incident").

3. A true and accurate photo of the noose as it appeared in November 2019 is set forth below:



4. Stevie, with the help of one of his supervisors, reported the terrorizing events to Pike management, but it was Stevie who paid the price. Pike cut his pay, Pike demoted him, and Pike ultimately fired him. In fact, Stevie later learned that Pike still employed the employee who threatened him with the knife, and Pike terminated the supervisor who helped Stevie report the terrifying events—but he *never* learned who hung the noose.

## BACKGROUND

5. In the United States during the late 19th and early 20th centuries, the lives of approximately 4,743 people were taken by way of lynching with a noose.[1] Of the 4,743 people lynched, 72.7% or 3,446 people were African American.[2] "A lynching was a performance that sent a message of white supremacy, warning all blacks to stay in their place. It was a *weapon of terror* that could strike anywhere, anytime, against any African American."[3] In November 2019, while in Clearwater, Florida, this severe and pervasive weapon of terror struck Stevie when he arrived at his workspace to find that one or more white Pike employees hung more than powerlines that day – they hung a noose and turned Pike machinery into the gallows, ready to turn Stevie into "strange fruit."[4]

6. There is no misconstruing what a noose denotes; it "symbolize[s] a deplorable act of brutality, along with unbound fear and hatred towards African Americans."[5] Nooses represent

---

[1] JAMES H. MADISON, LYNCHING IN THE HEARTLAND: RACE AND MEMORY IN AMERICA 14 (2001); NAACP, *History of Lynchings*, https://www.naacp.org/history-of-lynchings/ (last visited Jan. 1, 2021). *See also* Charles Seguin & David Rigby, *National Crimes: A New National Data Set of Lynchings in the United States, 1883 to 1941*, 5 SOCIUS: SOCIOLOGICAL RESEARCH FOR A DYNAMIC WORLD 1-8 (2019).
[2] Madison, *supra* note 1, at 14; NAACP, *supra* note 1.
[3] Madison, *supra* note 1, at 14 (emphasis added).
[4] "Strange fruit" references the 1939 Billie Holiday song "Strange Fruit," which discusses lynching of African American people. The song begins with: "Southern trees bear strange fruit, blood on the leaves and blood at the root, black bodies swinging in the southern breeze, *strange fruit hanging from the poplar trees*…." (emphasis added). Since its recording, it has been embraced by civil rights activists, used as a protest song, and in 1999 it was named the song of the century by *Time* Magazine. *See* Aida Amoako, *Strange Fruit: The Most Shocking Song of All Time?*, BBC CULTURE (Apr. 17, 2019), https://www.bbc.com/culture/article/20190415-strange-fruit-the-most-shocking-song-of-all-time.
[5] Alaa Elassar, *Why the Noose is Such a Potent Symbol of Hate*, CNN (June 23, 2020), https://www.cnn.com/2020/06/23/us/noose-hate-symbol-racism-trnd/index.html. *See also* Anti-Defamation League, *Noose, General Hate Symbols*, (Jan. 8, 2021), https://www.adl.org/education/references/hate-symbols/noose.

America's dark history of racial violence, but their use to intimidate, control, and lynch black people is not a thing of the distant past. In the twenty-first century nooses were hung outside the National Museum of African American History in Washington, D.C.,[6] in NASCAR driver Bubba Wallace's garage stall,[7] and on college campuses like American University[8] and Duke University.[9] And in November 2019, Pike Electric employees tied a hangman's noose, climbed up Pike machinery, secured it, and let it hang specifically for the only African American crew member to find.

7. Therefore, Stevie brings this civil action to assert his rights under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended ("Section 1981" or "1981"); and N.C.G.S. § 143-422.2, and seeks injunctive and declaratory relief, damages, and other appropriate legal and equitable relief for Defendant's unlawful, discriminatory, and retaliatory conduct.

## PARTIES

8. Plaintiff Stevie Lamont Stuckes is an African American citizen and resident of Mecklenburg County, North Carolina. At all times relevant herein, Stevie was an employee of Pike Electric, LLC until his termination of employment on May 29, 2020. Additionally, Stevie worked for Defendant in Mecklenburg County prior to his termination.

---

[6] Amy Held, *Second Noose Found in D.C., This Time at African American History Museum*, NPR (June 1, 2017), https://www.npr.org/sections/thetwo-way/2017/06/01/531034568/noose-found-at-national-museum-of-african-american-history.
[7] Amir Vera, Eric Levenson & Dianne Gallagher, *Dept. of Justice Looking into Noose Found in NASCAR star Bubba Wallace's Garage Stall*, CNN (June 22, 2020), https://www.cnn.com/2020/06/22/us/nascar-noose-bubba-wallace-spt-trnd/index.html.
[8] *See Dumpson v. Ade*, https://lawyerscommittee.org/wp-content/uploads/2018/12/2018.09.21-016-First-Amended-Complaint-Taylor.pdf (last visited Mar. 8, 2021); Stanley Augustin, *Landmark Settlement Between Hate Incident Perpetrator and Survivor Announced in* Dumpson v. Ade, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW (Dec. 18, 2018), https://live-lawyers-committee-2020.pantheonsite.io/landmark-settlement-between-hate-incident-perpetrator-and-survivor-announced-in-dumpson-v-ade/.
[9] JACK SHULER, THE THIRTEENTH TURN: A HISTORY OF THE NOOSE (PublicAffairs Books, 2018), https://jackshulerauthor.com/the-thirteenth-turn/; DAVID PILGRIM, WATERMELONS, NOOSES, AND STRAIGHT RAZORS: STORIES FROM THE JIM CROW MUSEUM (PM Press, 2018).

9. Defendant Pike Electric, LLC is a limited liability company organized and existing under the laws of the State of North Carolina with its principal place of business located in Surry County, North Carolina. Defendant conducts its business of developing, designing, and providing energy solutions to investor-owned utilities, municipalities, and independent power producers throughout North Carolina, including within Mecklenburg County. At all times relevant herein, Defendant was Stevie's employer. Defendant regularly employs 15 or more employees.

## JURISDICTION & VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff asserts claims that arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII") and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended ("Section 1981" or "1981").

11. The Court has jurisdiction over the claims alleged herein that do not arise under federal law pursuant to 28 U.S.C. § 1367.

12. The Court has jurisdiction over Defendant due to the Defendant's contacts within this forum and pursuant to N.C. Gen. Stat. § 1-75.1 *et seq.*

13. Venue is proper in this district pursuant 28 U.S.C. § 1391 because Defendant conducts business in this district and a substantial part of the events and unlawful employment practices complained of herein giving rise to this action occurred within this district.

14. The U.S. Equal Employment Opportunity Commission ("EEOC") received Stevie's Charge of Discrimination on July 14, 2020 alleging race discrimination, color discrimination, and retaliation. On December 10, 2020, the EEOC issued Stevie a Notice of Right to Sue for EEOC Charge No. 430-2020-02370. Stevie filed this action within ninety (90) days of

receiving the EEOC's Notice of Right to Sue. Accordingly, Stevie has complied with all Title VII jurisdictional requirements and exhausted all administrative prerequisites to initiating this action.

## FACTUAL BACKGROUND

15. Stevie is an African American man who was employed by Defendant from November 2017 until May 29, 2020. At the time of the Noose Event, Stevie worked for Defendant as a lineman tasked with placing power line poles, climbing the poles to service the lines, and other responsibilities associated with servicing power lines. Stevie's job reviews from Defendant were positive. He was an overall good employee performing at or above expectations.

16. While working for Pike on jobsites, Stevie experienced and witnessed racial epithets, racially charged "jokes," and discriminatory comments made by his co-workers against African Americans and people with darker complexions. Common place and indicative of discriminatory culture on Pike jobsites, these comments and "jokes" included phrases like "you don't know where you at, *boy*" and use of words like "nig" and "nigger." The comments and "jokes" were directed at Stevie to let him know his place as a black man among white people.

17. These comments and "jokes" were often made in the presence of Defendant's supervisors and crew leaders, but Defendant's supervisors and crew leaders took no action to stop the conduct. Instead, they were indifferent. Stevie came to learn that these "jokes" and comments were part of the Defendant's jobsite "culture."

18. In early October 2019, Stevie worked for Defendant as a lineman at the Clearwater Site. Defendant provided accommodations in Florida and provided travel from Charlotte, North Carolina ("Charlotte") to Florida and back.

19. While working at the Clearwater Site, Stevie was assigned to a crew. Sherrill "Keith" Meza ("Meza") was the Clearwater Site's crew leader. In addition to Stevie and Meza, there were three additional crew members, including Terry Skidmore ("Skidmore").

20. Stevie was the only African American person on Defendant's Clearwater Site crew.

21. Excluding Stevie, the other crew members working on Defendant's Clearwater Site crew were white and had lighter, fairer complexions than Stevie.

22. During Stevie and Skidmore's work relationship, Skidmore made racially derogatory comments about African American people and comments discriminating against people based on the color of their skin while in Stevie's presence.

23. On one occasion, Stevie, Skidmore, Meza, and other Clearwater Site crew members were at Church's Chicken ("Church's"), a fast-food restaurant company. While at Church's, Skidmore made derogatory comments about the African American staff.

24. Meza and other Clearwater Site crew members witnessed Skidmore's derogatory comments that belittled and discriminated against African American and black people.

25. Unfortunately for Stevie, this discriminatory jobsite culture escalated in early November 2019 when Skidmore pulled out a knife on Stevie.

### **The Knife Incident**

26. In or around early November 2019, Stevie and another employee were talking about their crew leader, Meza. Skidmore overheard the conversation and called Meza over. When Stevie asked Skidmore why he called Meza over, Skidmore drew a knife on Stevie and told Stevie to "mind your damn business" or Skidmore would "leave [him] right here."

27. Stevie, immediately frightened, backed off. He apologized to de-escalate the situation. The threat put Stevie in imminent fear of harm – Stevie knew Skidmore was in possession of a gun while in Clearwater and feared for his safety.

28. Upon information and belief, Skidmore threatened Stevie with the knife because Stevie is African American and has a darker complexion that Skidmore, who is white and is fairer in complexion.

29. Crew members witnessed the Knife Incident, including the Clearwater Site's crew leader, Meza.

30. Upon information and belief, after Stevie reported the Knife Incident to the Defendant, Defendant did not adequately investigate what happened; the Defendant did not reprimand Skidmore; nor did the Defendant fire Skidmore.

### "Strange Fruit" Hanging from Pike Machinery

31. Stevie thought that he had de-escalated the situation but was horribly wrong. Indeed, racial tensions came to a head on November 10, 2019. Stevie arrived at his normal Clearwater Site workspace to find a terrifying noose hanging from the Pike machinery, waiting to turn him into "strange fruit."

32. Although shocked, deeply disturbed, and terrified for his safety, Stevie solicited Meza's assistance to photograph the noose, pictured above.

33. After photographing the noose, Stevie returned to the room in which he was staying while he worked at the Clearwater Site.

34. Stevie was extremely scared and upset after finding the noose. It was evident to Stevie that the noose was intended for him. He knew the noose was meant for him because the

Clearwater Site crew was small, Stevie was the only African American crew member, and each crew member knew Stevie worked on that part of the Pike machinery.

35. That night, Stevie cried thinking that his white Pike coworkers may do something awful to him because he is African American and has a darker complexion than them. He did not want to be "strange fruit" hanging from a piece of Pike machinery.

36. For the rest of the evening, Stevie would not go anywhere by himself and he did not want to remain at the Clearwater Site after he found the noose. Stevie called his father searching for guidance on what to do.

37. After talking with his father, Stevie reported the Noose Incident to a Duke Energy employee who oversaw some of the Defendant's projects.

38. Stevie also reported the Knife Incident and the Noose Incident to the Defendant.

39. After Stevie reported the Knife and Noose Incidents to the Defendant, Defendant did not apprise Stevie about who hung the noose, whether anyone was reprimanded for hanging the noose, or whether Stevie would be in danger by working with certain Pike crew members. Defendant did nothing to alleviate the terror Stevie felt.

40. Indeed, Defendant fired Meza, the crew leader who helped Stevie photograph the noose.

41. Upon information and belief, around the time Defendant terminated Meza, through Defendant's representatives, employees, and agents, Defendant told Meza that instead of reporting the noose, he should have destroyed it and not told anyone.

## Two Demotions and a Pay Cut

42. After reporting the Knife and Noose Incidents, Stevie left the Clearwater Site. While still in Florida, through Pike Vice President James Banner ("Banner"), Defendant told

- 9 -
Case 3:21-cv-00098-RJC-DSC   Document 1   Filed 03/09/21   Page 9 of 20

Stevie that they were transferring him back to Charlotte.  Stevie asked Banner if his pay would change if he went back to Charlotte and Banner told him no.

43. Shortly thereafter, in mid-November 2019, Stevie returned to Charlotte.

44. Upon returning to Charlotte, Stevie learned that he was being demoted from his lineman position to a "floater" position.  As a floater, Stevie covered shifts for Defendant's employees who were out for some temporary reason.

45. While in Charlotte, Stevie's hourly pay was reduced by five dollars per hour, from approximately $27.54 to $22.76.

46. Stevie did not learn about his pay cut until after he returned to Charlotte.

47. After learning that his pay was cut, Stevie complained to Defendant, his supervisor, Tim Harris ("Harris"), about the pay cut.  Harris told him nothing could be done.

48. Upon information and belief, Defendant demoted Stevie and cut his pay to pressure or influence him into quitting his job with Defendant because Stevie is African American and reported discriminatory conduct.

49. It was not until late November 2019, after Stevie was already back in Charlotte, that Banner texted Stevie to inform him that one of Defendant's employees would call Stevie to discuss whether Defendant could keep Stevie's classification and pay rate at $27 per hour.

50. In those text messages, Banner stated that "worst case scenario" Stevie would have the *option* to stay at $27.

51. Stevie did not have the option to stay in Charlotte at $27.

52. Stevie remained in Charlotte with pay less than $27.

53. Stevie remained in Charlotte and worked as a floater for a few weeks until he was demoted yet again when he was assigned as an "underground" worker. As an underground worker, Stevie dug underground ditches and holes for powerlines for approximately four months.

54. Upon information and belief, Defendant demoted Stevie a second time to pressure or influence him into quitting his job with Defendant because he is African American and reported discriminatory conduct.

### Termination

55. In early May 2020, Harris organized a group meeting for Pike employees in Charlotte, North Carolina. At that meeting, Stevie and approximately four of Defendant's white employees were pulled away from the group and Harris told them that they were "laid off." Harris told the five they were being fired for "a lapse in work," but Stevie knew he was getting fired because he is African American, and he reported racial discrimination.

56. After Stevie was "laid off," Rob Whittaker, another supervisor at Pike, contacted Stevie about storm clean-up work. Stevie agreed to do it. At the end of May, the work came to an end, at which time Stevie contacted Harris about additional work. Harris told Stevie there was no additional work and he was terminated.

57. Shortly thereafter, however, Stevie learned that the four white employees who were allegedly "laid-off" at the same time as Stevie had either (1) gone back to work for Pike, (2) were offered an opportunity to return to Pike, or (3) were injured and could not complete work for Pike. At no time did Harris offer or contact Stevie about additional opportunities like Defendant had done for Stevie's white counterparts.

58. Upon information and belief, Defendant treated Stevie differently than his similarly situated white and fairer-skinned co-workers when:

  a. Defendant, through its representatives, agents, supervisors, and employees, permitted a culture at its jobsites that condoned racial discrimination;

  b. As a result of this racially discriminatory culture on its jobsites, Defendant's white employee pulled out a knife on Stevie and told him he would "leave [him] right there;"

  c. Furthermore, as a result of this discriminatory culture its jobsites, Defendant's employees sent a severe and pervasive message of white supremacy and used a historical weapon of terror by hanging a noose at Stevie's workspace;

  d. Defendant reduced Stevie's pay after he reported the discrimination;

  e. Defendant demoted Stevie twice; and

  f. Defendant fired Stevie.

59. Defendant discriminated against Stevie because he is African American.

60. Defendant discriminated against Stevie because he is black and darker in complexion that his co-workers.

61. Defendant demoted Stevie because he reported the discriminatory, racist, and colorist conduct.

62. Defendant did not demote Stevie because of Stevie's work performance, negative performance reviews, or the COVID-19 global pandemic.

63. Defendant cut Stevie's pay because he reported the discriminatory, racist, and colorist conduct.

64. Defendant did not cut Stevie's pay because of Stevie's work performance, negative performance reviews, or the COVID-19 global pandemic.

65. Defendant did not take adequate or effective remedial action after its agents, supervisors, employees, and crew leaders witnessed Defendant's white employees use racial epithets, racially charged "jokes," and discriminatory comments against African Americans and people with darker complexions in front of Stevie.

66. Defendant did not take adequate or effective remedial action after Defendant's white employees directed phrases like "you don't know where you at, *boy*" and words like "nig" and "nigger" at Stevie.

67. Defendant did not take adequate or effective remedial action after the Knife Incident or the Noose Incident because Defendant did not determine which Pike crew hung the noose or who hung the noose.

68. Instead, Defendant fired Stevie after he reported the discriminatory, racist, and colorist conduct.

69. Stevie was treated differently than his white counterparts.

## The EEOC Charge of Discrimination

70. On or about July 14, 2020, Stevie filed a Charge of Discrimination with the EEOC regarding the Defendant's discriminatory conduct. The bases for the Charge of Discrimination are race, color, and retaliation.

71. On December 10, 2020, the EEOC issued to Stevie the Notice of Right to Sue.

72. The ninety (90) day timeframe for filing a lawsuit after the Notice of Right to Sue's issuance has not lapsed.

# FIRST CLAIM FOR RELIEF
Violation of Title VII – Race/Color Discrimination
(Hostile Work Environment)

73. Stevie realleges and incorporates each and every one of the above allegations herein by reference.

74. Stevie is an "employee" as defined at 42 U.S.C. § 2000e(f), and Defendant is an employer as the term is defined at 42 U.S.C. § 2000e(b).

75. Stevie is a member of a protected class in regard to his race and color.

76. By the actions described above, Defendant discriminated against Stevie based on his race and color in violation of Title VII, and retaliated against Stevie in violation of Title VII in that, among other things:

    a. Defendant harassed, threatened, and humiliated Stevie on the basis of his race and/or color as specifically alleged by the facts in the above paragraphs;

    b. Defendant, through its representatives, supervisors, agents, and employees, allowed a culture of racial discrimination at its jobsites;

    c. Defendant, through its representatives, supervisors, agents, and employees knew of the culture of racial discrimination at its jobsites and did not take steps to remedy it;

    d. The racially charged discriminatory conduct resulted in Defendant's employees harassing, threatening, and humiliating Stevie when they hung a noose at Stevie's workspace – a "weapon of terror" used throughout history to direct fear and hatred at African American people and people with darker complexions;

    e. Defendant allowed, encouraged, and/or failed to prevent a hostile work environment for Stevie based on his race and/or color;

f. Defendant reduced Stevie's pay after he reported the discrimination based on his race and/or color;

g. Defendant demoted Stevie – twice – after he reported the discrimination based on his race and/or color;

h. Despite Stevie's positive work performance at or above Defendant's expectations, Defendant fired him after he reported the discrimination based on his race and color; and

i. Defendant treated Stevie differently than the similarly situated white employees.

77. Defendant's actions and omissions also constitute a hostile work environment because the conduct is severe and pervasive and alters the terms and conditions of his workplace.

78. Defendant actions and omissions in violation of Title VII subjected Stevie to race and color-based harassment and discrimination that a reasonable person would find hostile and abusive, and which Stevie did find hostile and abusive.

79. Defendant's actions and omissions in violation of Title VII were undertaken willfully, wantonly, and with reckless disregard for Stevie's federally protected rights.

80. Defendant's stated reasons for discriminating and retaliating against Stevie are a mere pretext for illegal discriminatory and retaliatory motives.

81. Stevie has exhausted his administrative remedies.

82. As a result of the discrimination, retaliation, and illegal conduct claimed herein, Stevie has suffered both monetary and non-monetary damages. Stevie demands such legal or equitable relief as will effectuate the purposes of Title VII, including but not limited to economic damages, including the accrual of back pay and front pay; compensatory damages; punitive

- 15 -
Case 3:21-cv-00098-RJC-DSC   Document 1   Filed 03/09/21   Page 15 of 20

damages; attorneys' fees and the cost of this action; equitable relief, including appropriate affirmative action and injunctive relief; and other relief this Court deems just and equitable.

## SECOND CLAIM FOR RELIEF
Retaliation under Title VII and Section 1981

83. Stevie realleges and incorporates each and every one of the above allegations herein by reference.

84. Stevie is an "employee" as defined at 42 U.S.C. § 2000e(f), and Defendant is an employer as the term is defined at 42 U.S.C. § 2000e(b).

85. By the actions described above, Defendant retaliated against Stevie after he reported Defendant's discrimination based on his race and/or color by reducing Stevie's pay, demoting him twice, and firing him.

86. Stevie is a member of a protected class in regard to his race and color.

87. Stevie complained to Defendant about the unlawful discrimination to which Stevie was subjected at the hands of Defendant's employees.

88. Stevie suffered adverse employment action as a direct result of his complaint in the form of a pay reduction, two demotions, and ultimately employment termination.

89. Defendant's actions were intentional, with reckless indifference to Stevie's rights and sensibilities.

90. As a result of the retaliation claimed herein, Stevie has suffered and will continue to suffer loss of past, present, and future earnings; loss of future retirement benefits; loss of enjoyment of life; mental anguish and distress; and other monetary losses in conformity with Title VII, 42 U.S.C. § 2000e *et seq*. and Section 1981, 42 U.S.C. § 1981.

## THIRD CLAIM FOR RELIEF
Violation of Section 1981 of the Civil Rights Act of 1866

91. Stevie realleges and incorporates each and every one of the above allegations herein by reference.

92. Stevie was an overall good employee performing at or above expectations.

93. Defendant discriminated against Stevie on the basis of his race and/or color with respect to the terms, conditions, and privileges of his employment by subjecting Stevie to a racially charged and discriminatory jobsite culture, reducing his pay, demoting him, and wrongfully terminating his employment.

94. Defendant, acting through its managers, employees, and agents, discriminated against Stevie because of his race and color in that: (a) they treated Stevie in a markedly hostile manner which a reasonable person would find objectively offensive; (b) they treated similarly situated white persons differently; and (c) they did not demote or terminate similarly situated white persons.

95. Similarly situated employees of the Defendant who had fairer complexions and/or who were white were not treated in the same manner as Stevie.

96. Further, Defendant terminated Stevie because of his race and/or color.

97. But for his race and/or color, Stevie would not have suffered the loss of a legally protected right.

98. Defendant's actions and omissions were willful, wanton, intentional, and malicious and made with reckless disregard for Stevie's rights. Defendant's actions caused Stevie loss of pay and benefits, humiliation, and embarrassment, justifying injunctive relief and monetary relief in conformity with 42 U.S.C. § 1981 *et seq.*

## FOURTH CLAIM FOR RELIEF
Wrongful Discharge in Violation of Public Policy

99. Stevie realleges and incorporates each and every one of the above allegations herein by reference.

100. Under N.C. Gen Stat. § 143-422.2, it is North Carolina's public policy to protect and safeguard the rights and opportunities of all persons to seek, obtain, and hold employment without discrimination or abridgement on account of race, color, religion, national origin, age, sex, or handicap by employers that regularly employ 15 or more employees.

101. Defendant is an employer that regularly employs more than 15 employees.

102. The Defendant's above acts and practices constitute unlawful discriminatory employment practices within the meaning of N.C. Gen. Stat. § 143-422.2.

103. As a result of Defendant's discriminatory acts, Stevie has suffered and will continue to suffer monetary damages and damages for mental anguish and humiliation unless and until this Court grants relief.

## FIFTH CLAIM FOR RELIEF
Negligent Retention and Supervision

104. Stevie realleges and incorporates each and every one of the above allegations herein by reference.

105. At all relevant times, Defendant had the authority to terminate its employees who participated in and/or were involved in the wrongdoings outlined herein.

106. At all relevant times, Defendant had a duty to exercise due care in the supervision and retention/hiring of its employees.

107. At all relevant times, Defendant had a duty to exercise ordinary care to protect Stevie from oppressive, discriminatory, and retaliatory conduct and injury from its employees and agents.

108. Defendant breached that duty and was negligent as follows: (a) Defendant failed to appropriately supervise its employees who participated in and/or were involved in the wrongdoings outlined herein; (b) Defendant knew or should have known in the exercise of reasonable care that the employees implicated herein did not have the appropriate training, knowledge, skill, and/or other qualities to serve in the role which they did in Defendant's employ; (c) Defendant was negligent in its continued retention of the employees implicated herein, in that Defendant knew or should have known in the exercise of reasonable care that its employees would engage in the wrongdoings discussed herein, and that such conduct would have the resulting injurious effect on Stevie; and (d) in other ways which will be proven at trial.

109. Defendant's negligent supervision and retention of its employees and agents directly and proximately caused injuries and harm to Stevie.

110. As a direct result of the Defendant's negligence in retaining and supervising Stevie's co-workers and superiors, and condoning their conduct, Defendant disregarded Stevie's federally protected rights and Stevie has been damaged in an amount exceeding $25,000, the exact amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a trial by jury and seeks the following relief:

a. Judgment be entered in favor of Stevie and against the Defendant finding the Defendant's actions violated 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, as amended, N.C.G.S. § 143-422.2, and North Carolina public policy;

b. A permanent injunction barring the Defendant from continuing to engage in illegal discriminatory conduct against Stevie and other African Americans and people with darker complexions who are employed or may be employed by Defendant in the future;

c. A permanent injunction directing the Defendant to take all affirmative steps necessary to remedy the effects of the illegally discriminatory conduct alleged in this Complaint and to prevent repeated occurrences in the future;

d. That Stevie has and recovers damages in an amount in excess of $25,000, to be determined at trial;

e. That Stevie has and recovers pre- and post-judgment interest on such award from the Defendant to the extent the law allows;

f. That Stevie has and recovers his reasonable attorney's fees to the extent the law allows;

g. That Stevie recovers punitive damages;

h. That the costs of this action be taxed against the Defendant; and

i. Any other relief the Court deems just and proper.

This 9th day of March, 2021.

Respectfully submitted,

**WEAVER, BENNETT & BLAND, P.A.**

By: *Abbey M. Krysak*
Abbey M. Krysak
NC Bar No. 46281
akrysak@wbbatty.com
196 N. Trade St.
Matthews, NC 28105
Tel: (704) 844-1400
Fax: (704) 845-1503
*Counsel for Plaintiff*